ADAM WOLF (SBN 215914)
**PEIFFER ROSCA WOLF ABDULLAH
CARR & KANE, A PROFESSIONAL LAW
CORPORATION**
4 Embarcadero Center
Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-3545
Fax: (415) 402-0058
Email: awolf@prwlegal.com

*Counsel for Plaintiffs and the proposed class*
*[additional counsel listed in signature block]*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| **KINGSLEY EZEUDE and CHUKWUKA OBI on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**PAYPAL, INC. AND PAYPAL HOLDINGS, INC.**<br><br>**Defendants.** | CASE NO. _____<br><br><br>**COMPLAINT**<br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

**COME NOW** Plaintiffs, Kingsley Ezeude and Chukwuka Obi, individually and on behalf of the Class described below, through their undersigned counsel.[1] Plaintiffs bring this action for damages against Defendants and demand a trial by jury.

---

[1] The allegations in the complaint are based on, among other things, counsel's review of documents filed in *Securities and Exchange Commission v. Traffic Monsoon, LLC and Charles David Scoville*, Case No. 2:16-cv-00832-DB (D. Utah July 26, 2016), documents filed with the Securities Exchange Commission, PayPal's user agreements and other publicly available documents concerning PayPal and Traffic Monsoon.

# INTRODUCTION

1.      Plaintiffs are victims of a Ponzi/Pyramid scheme operated by Charles David Scoville and Traffic Monsoon, LLC (the "Traffic Monsoon Scheme").  The Traffic Monsoon Scheme was facilitated by the knowing assistance and negligent actions of Defendant PayPal, Inc. ("PayPal").  PayPal's misconduct caused Plaintiffs and the putative class to suffer in excess of $5 million in net losses.

2.      The Traffic Monsoon Scheme affected over 162,000 investors throughout the world.  As alleged by the Securities and Exchange Commission in a separate federal action against Traffic Monsoon and Scoville, Traffic Monsoon took in approximately $207 million from these investors.[2]

3.      PayPal served as the payment processor for approximately $134 million worth of those investments and processed a massive amount of transactions on behalf of Traffic Monsoon. Indeed, Traffic Monsoon's meteoric and highly unusual rise quickly placed that scheme among PayPal's largest – and "highest risk" – digital content merchants. PayPal also acted as a conduit through which Traffic Monsoon and Scoville siphoned and stole investor money.

4.      The scheme lasted from September 2014 through July 2016.  During this time, Traffic Monsoon duped investors into believing it was "a specialized advertising and revenue sharing company" that operated a pay-to-click and Internet traffic exchange program.  On its website, Traffic Monsoon falsely told investors that it was not selling investments or operating a Ponzi/pyramid scheme that would pay returns to existing investors with money from new investors.

5.      Traffic Monsoon also concealed from its investors that Scoville, its sole member and operator, had a prior history of defrauding investors through similar pay-to-click investment "businesses." Unbeknownst to investors – but known to PayPal – Traffic Monsoon was not

---

[2] *Securities and Exchange Commission v. Traffic Monsoon, LLC and Charles David Scoville*, Case No. 2:16-cv-00832-DB (D. Utah July 26, 2016). Traffic Monsoon and Scoville cannot be sued, pursuant to the Court's order instituting a receivership. In any event, any recovery from Traffic Monsoon and Scoville in the receivership action will be far less than the losses suffered by Traffic Monsoon investors.

Scoville's first fraudulent investment scheme disguised as a "pay-to-click" program. In fact, just as he did with Traffic Monsoon, Scoville ran his prior pay-to-click schemes with PayPal's support and through PayPal's infrastructure. Indeed, in 2011 PayPal had banned Scoville from using its services following allegations that Scoville was operating a substantially similar – and similarly fraudulent – "pay-to-click" investment scheme. Yet, despite its knowledge of Scoville's past pay-to-click schemes and its knowledge that pay-to-click websites have Ponzi/pyramid scheme features, PayPal failed to enforce its own ban and allowed Scoville to open an account for Traffic Monsoon in September 2014, using PayPal's infrastructure to perpetrate and profit from his new – but similar in its material respects – "pay-to-click" investment fraud.

6.      Traffic Monsoon purported to sell through PayPal seven Internet advertising products, including a product called the "Banner AdPack" ("AdPack").[3] Traffic Monsoon solicited sales in AdPacks by promising that each investor would receive 1000 visits to the investor's website, 20 clicks on the investor's banner advertisement that would be listed on the Traffic Monsoon website, and – crucially – a cash component in the form of sharing in Traffic Monsoon's daily revenue.

7.      The cash component amounted to a return of 10% of an investor's investment in AdPacks, payable in two months through PayPal. The cash return was the main reason why Traffic Monsoon investors flocked to Traffic Monsoon.

8.      Investors entrusted Scoville and Traffic Monsoon with their money and trusted and depended on Scoville, with his superior knowledge, to manage their money and share revenue as promised by Traffic Monsoon.

9.      The sad reality is that Traffic Monsoon's advertising business was a scam designed to disguise its sale of unregistered securities in a Ponzi scheme, perpetrated through PayPal's infrastructure and with its knowledge and crucial assistance. Traffic Monsoon made 99% of its revenues from the sale of AdPacks, which took place through PayPal; it could not

---

[3] Although investors had the option to invest in Traffic Monsoon through bank accounts or credit cards, the overwhelming majority of investors in Traffic Monsoon during the Class Period invested through PayPal.

COMPLAINT

pay investors revenues without the sales of additional AdPacks. Nor could Traffic Monsoon deliver the advertising services promised in the AdPacks that investors purchased. Instead, Traffic Monsoon relied on money from newer investors in AdPacks – collected through and maintained at PayPal – to pay, through PayPal, the revenue sharing promised to earlier investors.

10.    PayPal played a crucial – indeed, indispensable – role in the Traffic Monsoon scheme.  PayPal transferred investor money to Traffic Monsoon and transferred new investor money from Traffic Monsoon to earlier investors, in Ponzi scheme fashion.  PayPal served as the payment processor for approximately $134 million worth of investments in the Traffic Monsoon Scheme. In an unusual and highly atypical departure from its core business – payment processing – PayPal aggregated and held Traffic Monsoon's money - millions of dollars - in PayPal Account Number XXXXXX7752 ("PayPal Account 7752") until investors requested to withdraw their earnings. As a result of withdrawal requests, PayPal also paid out these earnings that totaled approximately $61 million.  When the scheme was exposed in July 2016, Traffic Monsoon had approximately $23 million in PayPal Account 7752.

11.    PayPal played this crucial role with knowledge of Traffic Monsoon's fraud and misrepresentations to investors, acquired through its past experience with Scoville's previous iterations of the Traffic Monsoon fraud; its review of Traffic Monsoon's website as part of its account verification process; its ongoing review of the high-risk, unusual Traffic Monsoon account; its processing of Traffic Monsoon's Ponzi/pyramid transactions; and its handling of inquiries from numerous Traffic Monsoon investors.

12.    While PayPal prides itself on its anti-fraud detection and advertises its anti-fraud detection abilities as a key safety feature of its infrastructure, its internal controls were severely lacking or nonexistent with regard to its oversight of its Traffic Monsoon-related activities.

13.    PayPal was aware that Scoville had previously operated similar pay-to-click businesses that PayPal banned from using its services following allegations that the businesses were Ponzi/pyramid schemes.  PayPal is also aware that pay-to-click businesses raise concerns regarding fraud and that some have Ponzi/pyramid scheme features. Indeed, PayPal has placed

holds or bans on other pay-to-click businesses. Yet PayPal did not enforce its own ban on Scoville's use of its services. By knowingly allowing Scoville's new pay-to-click scheme, Traffic Monsoon, to use its services, PayPal departed from its own policy that prohibits the use of its services for "transactions that . . . support pyramid or ponzi schemes." (PayPal Acceptable Use Policy.)

14.     PayPal was aware that Traffic Monsoon was falsely representing to investors that it sold advertising services, not investments.  Scoville told PayPal (but not investors) that Traffic Monsoon offered investments, which PayPal noted in PayPal Account 7752.  When PayPal reviewed Traffic Monsoon's website to verify the information provided by Scoville, PayPal learned that Traffic Monsoon was a pay-to-click scheme; represented to investors that Traffic Monsoon sold advertising services, not investments; and promised to make payments to investors in pyramid scheme fashion.

15.     PayPal also knew that Traffic Monsoon was a Ponzi/pyramid scheme. PayPal actively monitored Traffic Monsoon's PayPal account. It was aware of each investment and each withdrawal from the account. PayPal was aware that Traffic Monsoon was making Ponzi/pyramid scheme payments to investors and that Traffic Monsoon's Ponzi/pyramid scheme was growing exponentially in classic Ponzi/pyramid scheme fashion.

16.     PayPal provided substantial assistance to the Traffic Monsoon Scheme by allowing Traffic Monsoon to use its services in an extraordinary and atypical manner.   It allowed Traffic Monsoon to use its services to support a Ponzi/pyramid scheme, which is a violation of PayPal's acceptable use policy.  PayPal also allowed Traffic Monsoon to use PayPal Account 7752 to hold millions of dollars of investors' funds. This activity is an extreme departure from PayPal's business as a "a leading technology platform company that enables digital and mobile payments on behalf of consumers and merchants worldwide." (PayPal Holdings, Inc. Annual Report for Fiscal Year Ended December 31, 2015 at 1.). It is also unusual, because PayPal accounts are not FDIC insured and do not bear interest. As a result, Traffic Monsoon was holding millions of dollars in an unsecured account without earning any interest on that balance, and all the interest earned by those funds throughout this time was

accruing to PayPal itself – a highly atypical source of income for PayPal.

17.     In return for allowing the atypical and extraordinary use of its services, PayPal profited greatly from the Traffic Monsoon Scheme. PayPal earned fees from the hundreds of thousands of transactions made by Traffic Monsoon investors.  PayPal also earned interest on the millions of dollars of investors' funds that PayPal uncharacteristically held in PayPal Account 7752 (which as of February 2016 had a balance of approximately $61 million).

18.     PayPal also provided substantial assistance to Traffic Monsoon and Scoville's fraud by cloaking Traffic Monsoon with a false air of legitimacy that reasonably caused investors to believe that their transactions with Traffic Monsoon were legitimate and protected from fraud.  Indeed, PayPal allowed Traffic Monsoon to display its name on Traffic Monsoon's website and use an email address, "paypal@trafficmonsoon.com." PayPal created a false sense of security by allowing Traffic Monsoon to use its services in an atypical, fraudulent manner, while at the same time publicly assuring Traffic Monsoon investors that PayPal employs proprietary fraud and risk modeling to assess risk and detect fraud associated with its accounts. For example, on its website, PayPal represents to the public: "Know your payments are secure, whether you're buying or selling, get the security you expect plus purchase or seller protection on all eligible transactions."     In addition, PayPal must comply with risk rules set by payment card processors and banks.  Accordingly, PayPal implements specific business processes and supervises merchant accounts to detect whether merchants are engaged in illegal or high-risk activities.  (PayPal Holdings, Inc. Annual Report for Fiscal Year Ended December 31, 2015 at 17.) For example, "For 'high risk' merchants, [PayPal] must either prevent such merchants from using our PayPal services or register such merchants with the payment card networks and conduct additional monitoring with respect to such merchants.  (*Id*.) High risk activities are "primarily the sale of certain types of digital content." (*Id.*)

19.     By creating a false air of legitimacy as to Traffic Monsoon, PayPal assisted Traffic Monsoon's ability to deceive investors into purchasing AdPacks through PayPal, with the false belief that Traffic Monsoon was selling digital advertising services, instead of investments in a Ponzi/pyramid scheme.

20.    PayPal also substantially assisted the scheme by facilitating Traffic Monsoon's continued retention of investors' funds in PayPal Account 7752.

21.    In January 2016, PayPal suspended withdrawals from PayPal Account 7752. PayPal told Scoville that the exponential growth in a short time frame and very low chargebacks associated with the account marked it as a Ponzi scheme.

22.    Remarkably, while aware that Traffic Monsoon was a Ponzi/pyramid scheme and suspending *withdrawals*, PayPal continued to allow the Traffic Monsoon Scheme to victimize more investors by accepting *deposits* from new investors for another 30 days, until February 2016. PayPal allowed Traffic Monsoon to receive investments from new victims despite its knowledge that Traffic Monsoon was a Ponzi/pyramid scheme.  Indeed, PayPal allowed these deposits from new investors despite having set up a specific phone number for Traffic Monsoon investors to call PayPal regarding their concerns about Traffic Monsoon.

23.    In February 2016, PayPal finally prohibited any additional investment in Traffic Monsoon through its services. PayPal instituted a "freeze" on PayPal Account 7752 that prohibited any deposits or withdrawals from the account. Although this freeze was supposed to last until August 2016, PayPal prematurely removed the freeze in July 2016. Thereafter, PayPal allowed Scoville to withdraw millions of dollars from PayPal Account 7752, through numerous withdrawal transactions of up to $100,000 each, several times *daily* for nearly a month.

24.    On July 26, 2016, in response to a complaint filed by the SEC against Traffic Monsoon and Scoville alleging securities fraud, the United States District Court for the District of Utah issued a temporary restraining order against Traffic Monsoon and Scoville.  This order essentially shut down the Traffic Monsoon Scheme.  The court has since granted a preliminary injunction against Traffic Monsoon based on its findings that Traffic Monsoon operated as a Ponzi scheme, which was inherently deceptive, that sold securities in violation of the law.  The court also appointed a receiver to protect the assets of Traffic Monsoon.  The case remains pending.

### THE PARTIES

25.    Plaintiff Kingsley Ezeude is a resident of Alberta, Canada. On December 31,

7

2015, Plaintiff Ezeude invested $260.47 in Traffic Monsoon. On January 2, 2016, Plaintiff Ezeude invested $247.98 in Traffic Monsoon. On January 8, 2016, Plaintiff Ezeude invested $1,707.98 in Traffic Monsoon. All three investments were routed by PayPal into Traffic Monsoon's PayPal account.

26.     Plaintiff Chukwuka Obi is a resident of Alberta, Canada.  On January 2, 2016, Plaintiff Obi invested $520.62 in Traffic Monsoon.  On January 4, 2016, Plaintiff Obi invested $1,040.94 in Traffic Monsoon.  On January 5, 2016, Plaintiff Obi invested $520.62 in Traffic Monsoon.  On January 6, 2016, Plaintiff Obi invested $52.34 in Traffic Monsoon.   And on January 20, 2016, Plaintiff Obi invested $104.38 in Traffic Monsoon.  All five investments were routed by PayPal into Traffic Monsoon's PayPal account.

27.     Defendant PayPal, Inc. is a Delaware Corporation doing business in the State of California.  PayPal's headquarters are located in Santa Clara County, California.

28.     PayPal, Inc. is licensed by the California Department of Business Oversight to conduct business as a Money Transmitter in this state, and indeed conducts such business in the state of California.

29.     Defendant PayPal Holdings, Inc. is a Delaware corporation with its principal place of business in San Jose, California.  PayPal Holdings, Inc. is the parent company of PayPal, Inc. and holds directly or indirectly all of the assets and liabilities of PayPal, Inc. PayPal Holdings, Inc. is therefore liable for the conduct of PayPal, Inc., including the liabilities that it assumed through its acquisition of PayPal, Inc. in July 2015.

## OTHER RELEVANT NON-PARTIES

30.     Although Plaintiffs do not know the specific names at this time, Plaintiffs believe that the following persons identified herein as DOES 1 to 4 were involved with PayPal's substantial assistance of the Traffic Monsoon Ponzi/pyramid scheme:  a) John Doe 1 is an officer of PayPal in its Global Asset Protection group; b) John Doe 2 is an officer and manager of PayPal who is responsible for overseeing PayPal's proprietary fraud and risk modeling program; c) John Doe 3 was the account manager for PayPal Account 7752; and d)  John Doe 4 is an officer and manager of PayPal who oversees PayPal's Merchant Services, including the

on-boarding account manager for PayPal Account 7752.

## JURISDICTION AND VENUE

31.    This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) and § 1332(d), as amended by the Class Action Fairness Act of 2005. The matter in controversy exceeds Five Million Dollars ($5,000,000.00), exclusive of interest and costs. Plaintiffs and members of the Class are citizens of a foreign state and Defendant is a citizen of a State. This Court also has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

32.    This Court has personal jurisdiction over Defendants because (a) Defendants are operating, presenting, and/or doing business within this District, (b) Defendants reside within this jurisdiction, and (c) Defendants' breaches and tortious activity occurred within this District.

33.    Venue is proper under 28 U.S.C. § 1391 in that Defendants reside in this judicial district.

34.    Venue is also proper under 28 U.S.C. § 1391 because many of the acts and practices complained of herein incurred in a substantial part in this judicial district.

35.    **Intradistrict Assignment (L.R. 3-2(b)):** This action arises in Santa Clara County, a county encompassed in the San Jose Division of this District because a substantial part of the events or omissions which give rise to the claim occurred in Santa Clara County and Defendant has executive offices and conducts business in Santa Clara County.

## FACTUAL ALLEGATIONS

### 1.    Traffic Monsoon Perpetrates a Ponzi/pyramid Scheme Through PayPal

36.    Traffic Monsoon is a limited liability company registered with the State of Utah. Scoville formed Traffic Monsoon in October 2014 and is the sole member.

37.    On its website, Traffic Monsoon described its business as a pay-to-click advertising and revenue sharing company.  Some of these representations are as follows:

-    TrafficMonsoon.com is a specialized advertising and revenue sharing company that allows international participation of individuals and groups. . . . [O]ur services provide high quality advertising targeted for people seeking for a way to earn money online along with a complete account privacy, top

level online security, an efficient account management, and a dedicated support team.

-   Our company's traffic generation resources are capable of sending your website several thousands of visitors quickly. All our members have equal opportunity to benefit from an attractive revenue sharing plan on a long-term basis. There is truly no risk to our revenue sharing plan, because the quality of advertising services you're paying for out-weigh the price. You'll really notice the difference with Traffic Monsoon in results, and profit.

38.    Traffic Monsoon marketed its services as a combination of an Internet traffic exchange and a pay-to-click program. A traffic exchange allows users to browse other users' websites. A pay-to-click program pays users to click on website banner advertisements.

39.    The Traffic Monsoon Scheme involved Traffic Monsoon's purported sale of seven Internet advertising products, including the AdPack. Investors purchased each AdPack for $50.  Traffic Monsoon solicited sales in AdPacks by promising that each investor would receive 1000 visits to the investor's website ("exchange credits"), 20 clicks on the investor's banner advertisement listed on the Traffic Monsoon website, and the potential to share in Traffic Monsoon's own daily revenue.

40.    The revenue sharing feature was the key feature of the Traffic Monsoon Ponzi scheme and the main driver to attract new investors.

41.    Traffic Monsoon offered revenue sharing of up to $55 for each AdPack – a 10% return on the initial purchase.

42.    Only investors who purchased AdPacks were entitled to share in Traffic Monsoon's revenue.

43.    To share in daily revenue, an investor in an AdPack had to click on a specific number of banners advertisements in the traffic exchange in that given 24-hour period.

44.    After an AdPack earned $55, an investor had to purchase a new AdPack to continue to share in Traffic Monsoon's profits.  An investor could withdraw the $55 from Traffic Monsoon's PayPal account or use the $55 to buy a new AdPack.

COMPLAINT

45.    In other words, once the investor's investment matured and generated the 10% return, the investor had the option of cashing out or rolling his existing investment and profit into a new AdPack investment.

46.    Traffic Monsoon also offered to sell 1000 exchange credits and 20 clicks without the combination offered by the AdPack.  If an investor purchased the 1000 exchange credits and 20 clicks without the combination of the AdPack, then these services cost $10.95.  As a result, with the purchase of an AdPack, an investor paid approximately $40 for the revenue sharing component of the AdPack.

47.    Accordingly, the largest portion of an AdPack's value rested in its revenue sharing feature, not in the exchange credits or clicks.

48.    Traffic Monsoon made a series of representations on its websites that it was not offering investments and that it was not a Ponzi/pyramid scheme.  These representations included:

> -  Only 1 of the services we offer includes a revenue sharing position. We do not sell "shares." We only sell advertising services. It's from the sales of all our services that we share revenues.  When our members purchase a service from TrafficMonsoon, the revenues from that purchase are held by the company. Then, you can qualify to receive share of the profits! Naturally there is cost associated with providing services. Each service provided generates a profit margin. We share those profits with you!
>
> -  You'll share in revenues today from purchases made yesterday. This provides us a full day to catch fraudulent payments before they are shared. If we're ever attacked with a large fraudulent payment, it will be caught and blocked before it impacts member accounts.
>
> -  Why is Traffic Monsoon not a ponzi? Traffic Monsoon only offers ad services. Nothing else is for sale than ad service. There is no investment plan offered. Yes, you can qualify to share in the sales revenue generated when services are sold by actively viewing other people's websites, but this is not

COMPLAINT

interest.

- A purchase of advertising service with Traffic Monsoon is not considered a deposit, nor investment. In fact members agree to this as part of our terms of service when they sign-up.

- Traffic Monsoon has all the money to pay people what they have earned. . . . In conclusion, when looking at pure definitions, Traffic Monsoon is not a ponzi and is not a pyramid scheme. It's a business that sells advertising services, offers sales commissions, and allows members to qualify to share in the sales revenues by actively viewing other member websites.

49.    When investors purchased an AdPack, Traffic Monsoon required the investor to agree to several terms and conditions.  These terms and conditions included:

- TrafficMonsoon registered as a limited liability company and not a bank nor a security firm. A purchase of advertising service with us is not considered a deposit, nor investment.

- You agree to recognize TrafficMonsoon as a true advertising company which shares its revenues, and not as any form of investment of any kind.

50.    Investors entrusted Scoville and Traffic Monsoon with their money, and trusted and depended on Scoville, with his superior knowledge, to manage their money and share revenue as promised by Traffic Monsoon.

51.    Traffic Monsoon sold its AdPacks chiefly through PayPal. The revenue from the sale of each AdPack was held in Traffic Monsoon's PayPal Account 7752.

52.    Traffic Monsoon claims to have distributed the revenue from the sale of each AdPack as follows:   10% as a commission to the person who introduced the investor, if applicable; 4.5% was retained by Traffic Monsoon; 1.5% to Traffic Monsoon's programmer; and 84% was distributed to other AdPack investors or held in a reserve fund, which was also held in PayPal Account 7752, for future distribution to investors.

53.    Unbeknownst to investors, Traffic Monsoon used the money in its PayPal-held reserve fund to supplement investors' profit sharing and to smooth out profit sharing payments

– that is to say, Traffic Monsoon used PayPal-held funds to pay – through PayPal – existing investors with new investors money, in typical Ponzi scheme fashion.

54.    Traffic Monsoon typically paid AdPack investors $55 per $50 AdPack in returns, in 60 days.

55.    Traffic Monsoon falsely represented to investors that the revenue sources available for profit sharing came from its sales of all of its services, including Pay-to-click Banner Ad Campaigns, Pay-to-click Text Ad Campaigns, Traffic Exchange Start Pages, Traffic Exchange Credit Purchases, Monsoon Traffic Packages and Login Ads.

56.     Traffic Monsoon – which had been reviewed by PayPal – stated that revenues came from the sale of all of its advertising products:

>    It's from the sale of all our services that we share revenues. When our members purchase a service from TrafficMonsoon, the revenues from that purchase are held by the company. Then, you can qualify to receive share of the profits! Naturally there is a cost associated with providing services. Each service provided generates a profit margin. We share those profits with you!

57.    Unbeknownst to investors, but known to PayPal, Traffic Monsoon's sales were almost 100% tied to its sale of AdPacks. Since October 2014, 98% of the money shared with investors (approximately $618 million) came from investors' purchases of AdPacks, chiefly through PayPal.

58.    Traffic Monsoon relied almost exclusively on the sale of additional AdPacks to pay returns to AdPack investors, as PayPal knew.  Thus, Traffic Monsoon was using money from new investors to pay supposed "returns" to existing investors, in Ponzi/pyramid scheme fashion.

59.    Traffic Monsoon, however, never disclosed to investors that:  1) it could not pay any returns to investors without the sales of additional AdPacks and that over 98% of the returns shared with investors came from subsequent purchases of AdPack; 2) the AdPack products it was selling were securities; and 3) Traffic Monsoon was orchestrating a Ponzi/pyramid scheme and was using money from new investors to pay supposed "returns" to existing investors.

PayPal knew this, too.

60.    Traffic Monsoon's advertising business was a scam designed to disguise its offering and sale of securities in a Ponzi scheme.

61.    Traffic Monsoon's business was not real. The price of the AdPack did not relate to the price of the service it included. And the $55 profit ceiling lacked any rationale tied to Traffic Monsoon's purported sale of advertising services. It simply represented a 10% return on the AdPack purchase amount.

62.    Traffic Monsoon lost $5 on each sale of an AdPack. With the revenue sharing, Traffic Monsoon paid $5 more to each AdPack investor than Traffic Monsoon charged for the AdPack. Because Traffic Monsoon had no material source of revenue other than the sales of AdPacks, Traffic Monsoon relied on the sale of new AdPacks – chiefly through PayPal – to pay returns to the earlier investors, as PayPal well knew.

63.    Traffic Monsoon was a Ponzi/pyramid scheme that was not sustainable.

64.    Because Traffic Monsoon was a Ponzi scheme, it was inherently deceptive and fraudulent. Traffic Monsoon generated a false appearance of profitability by using money from new investors to generate returns for earlier investors. Indeed, Traffic Monsoon lied to investors by telling them that the returns were generated by its advertising business revenue and falsely claiming that the sale of AdPacks was not a Ponzi scheme.

**2.  Traffic Monsoon Sold Unregistered Securities**

65.    The AdPacks were securities, and were neither registered nor exempt from registration.

66.    The AdPack qualifies as a security because it was an investment contract.  The AdPack was an investment of money in a common enterprise with profits to come from the efforts of others:

   A.    An investor's purchase of an AdPack involved an investment of money of $50, made through PayPal, with an expectation that the investor would share in Traffic Monsoon's profits.

   B.    Traffic Monsoon aggregated the funds from the sale of AdPacks in

PayPal Account 7752. This account included those funds that Traffic Monsoon designated as the Traffic Monsoon reserve fund. Traffic Monsoon used money from the PayPal reserve fund to supplement the revenue sharing that it paid to investors.

C.       The payment of returns on the investment depended almost entirely on Traffic Monsoon's ability to sell AdPacks. The financial success or failure of the investment was inextricably tied to the efforts of Scoville and Traffic Monsoon.

D.       Investors relied on Traffic Monsoon and Scoville to operate the traffic exchange, collect revenue and distribute revenue shares to AdPack members. The actions that an investor was required to take to qualify for revenue sharing were a sham. Regardless of whether an investor owned one AdPack or thousands of AdPacks, an investor was required to click on a limited number of advertisements each day for a few seconds. Traffic Monsoon populated these advertisements for the investor and counted down the required time.

67.    Traffic Monsoon's sale of AdPacks was thus the sale of unregistered securities.

68.    From on or about September/October 2014 until July 2016, Traffic Monsoon raised millions of dollars from investors worldwide – chiefly through PayPal – through its unregistered offerings of securities.

69.    Traffic Monsoon offered and sold the AdPacks through its website. Traffic Monsoon's website was publicly available to anyone.

70.    Traffic Monsoon sold the AdPacks openly to the public without any determination regarding whether investors were accredited within the meaning of federal securities laws.

71.    Plaintiffs are not accredited investors.

### 3.   Traffic Monsoon and Scoville Knowingly Defrauded Investors

72.    Scoville knowingly defrauded investors by creating and operating Traffic Monsoon as a Ponzi/pyramid scheme.   Since Scoville solely controlled Traffic Monsoon, Scoville's knowledge can be imputed to Traffic Monsoon.

73.    To further the Traffic Monsoon scheme, Scoville made a series of intentional misrepresentations to investors.

74.    Scoville was aware that the AdPacks could be considered an investment. Indeed, he went out of his way to argue that the AdPacks are not investments.

75.    Scoville was aware that the $55 profits have always been paid to purchasers of AdPacks even though he represented to investors that there was no assurance it would be paid.

76.    On its website, Traffic Monsoon, through Scoville, also misrepresented that Traffic Monsoon was not a Ponzi scheme or pyramid scheme. Traffic Monsoon devoted a section of its website to explaining why Traffic Monsoon was not a Ponzi or pyramid scheme. This section included misrepresentations that "There is no investment on Traffic Monsoon; only a purchase of advertising service"; "[Investors] are only buying an ad service. A service was selected and paid for, which was immediately made available upon successful purchase"; and "Traffic Monsoon has all the money to pay people what they have earned."

77.    Traffic Monsoon also concealed from its investors crucial information regarding Scoville's history of defrauding investors through similar investment programs that Scoville also ran with PayPal's support and through PayPal's infrastructure.

### 4.  PayPal's Operations and Anti-Fraud Features

78.    PayPal operates an online payment processor business serving individuals and businesses worldwide.   PayPal describes its business as "a leading technology platform company that enables digital and mobile payments on behalf of consumers and merchants worldwide."  (PayPal Holdings, Inc. Annual Report for Fiscal Year Ended December 31, 2015 at 1.)

79.    On its website, PayPal describes its services as a secure, easy way to pay and get paid.  PayPal further states: "Know your payments are secure, whether you're buying or selling, get the security you expect plus purchase or seller protection on all eligible transactions." It allows users to sign up for free, assuring that users can "[m]ake the most of your money."

80.    PayPal boasts that over 180 million people use PayPal to pay securely on millions of sites and that "businesses that use PayPal can sell more."

81.     Typically, an online business will include a link to PayPal on its website. A customer can click on the PayPal link. The customer is then transferred to a secure PayPal webpage. The customer then provides PayPal with payment information.

82.     On its website, PayPal also describes the security protections that PayPal offers businesses against fraud: "We analyse every transaction in real time to help prevent fraud. You can even filter or block higher risk payments for optimal online security."

83.     PayPal explains the "security advantages" that it offers to users:

> Our security advantages
>
> Your business is safer when you get paid with PayPal
>
> We detect most fraudulent transactions in real-time.
>
> Our progressive system upgrades help keep us ahead of fraudsters.
>
> We have extensive data encryption for strict confidentiality and security.
>
> We monitor transactions 24/7
>
> Our dedicated team of anti-fraud specialists keep an eye out for you.

84.     PayPal accounts are not interest bearing. Any balance held in a user's PayPal account is not insured by the FDIC. The balance is an unsecured claim against PayPal.

85.     PayPal ostensibly prohibits the use of its services for activities that "1) violate any law, statute, ordinance or regulation; . . . [and] 3) relate to transactions that . . . support pyramid or **ponzi schemes**, matrix programs, other 'get rich quick' schemes or certain multi-level marketing programs." (PayPal Acceptable Use Policy (*emphasis added*).)

86.     PayPal offers buyer and seller protection programs so that both buyers and sellers can transact using PayPal with confidence. (PayPal Holdings, Inc. Annual Report for Fiscal Year Ended December 31, 2015 at 6.).

87.     PayPal Holdings, Inc. describes how it seeks to "differentiate itself from industry participants on the safety of transactions (our risk management capabilities as well as protection of consumer account details)." "Further, unlike traditional four-party networks or other mobile payment solutions, PayPal has a direct financial relationship with both its consumers and merchants. As a result of our risk management capabilities, PayPal can provide its customers

with protection from fraud and other losses incurred by participants to a transaction." (PayPal Holdings, Inc. Annual Report for Fiscal Year Ended December 31, 2015 at 6.).

88.    PayPal Holdings, Inc. also explains how its protection of merchants and consumers has been "imperative" to its success as a payment service provider:

> Protecting merchants and consumers from loss is imperative to successfully competing in the payments industry. Trust and security are essential for our customers, and PayPal invests significantly in providing both merchants and consumers with comprehensive protection. The risk to merchants and consumers (and their payments partners) from fraudulent activities, such as account takeover, identity theft and counterparty malicious intent, is growing. Our ability to protect both consumers and merchants is based largely on our ability to leverage the data we collect on transactions and our analytical capabilities. We believe mobile devices will play an important part in the future of commerce, creating the opportunities to make our ecosystem safer. For example, PayPal is able to use location data from mobile devices and growing protection for the mobile operating environment to reduce risk to merchants and consumers.
>
> We enable consumers to make payments safely and simply without sharing sensitive financial information, such as credit card or debit card numbers, with merchants or other consumers. To make payments using PayPal, consumers need to disclose only their email address or mobile phone number to merchants. The account-based nature of our Payments Platform helps us to better detect and prevent fraud when funds enter, flow through and exit the Payments Platform because our transactions are tokenized and because payment authorization credentials are separated from account holder information. Our ongoing investment in systems and processes designed to enhance the safety and security of our products reflects our goal of having PayPal recognized as one of the world's most

trusted payments brands.

We provide merchants and consumers with protection programs on substantially all transactions completed through our Payments Platform, except for transactions using our gateway and Paydiant products. These programs protect both merchants and consumers from loss primarily due to fraud and counterparty non-performance. Our risk management capabilities allow us to provide these protections, which are generally much broader than those protections provided by other participants in the payments industry. Most payments providers do not offer merchant protection in general, and those that do so generally do not provide protection of online or card not present transactions. As a result, merchants may incur losses for chargebacks and other claims on certain transactions when using other payments providers that they would not incur if they had used PayPal's payments services. PayPal also provides consumer protection against losses on qualifying purchases and accepts claims for 180 days post transaction in the markets that PayPal serves. This protection is generally consistent with, or better than, that offered by other payments providers. We believe that as a result of these programs, consumers can be confident that they will only be required to pay if they receive the product in the condition as described, and merchants can be confident that they will receive payment for the product that they are delivering to the customer.

Our Payments Platform utilizes a combination of proprietary technologies and services as well as technologies and services provided by third parties. We have developed intuitive user interfaces, customer tools and transaction processing, database and network applications that help enable our users to reliably and securely complete transactions on our sites and help our customers to utilize our suite of services. Our technology

COMPLAINT

infrastructure simplifies the storage and processing of large amounts of data, eases the deployment and operation of large-scale global products and services, and automates much of the administration of large-scale clusters of computers. Our technology infrastructure has been designed around industry-standard architectures to reduce downtime in the event of outages or catastrophic occurrences. We strive to continually improve our technology infrastructure to enhance the customer experience and to increase efficiency, scalability, and security.

89.    PayPal earns fees from transactions. The recipient of the transferred payment usually pays the transaction fees.

90.    PayPal sets the amount of the fee based on the method of payment. For example, fees may be waived or lower for payments from PayPal account balances. There are additional fees if the user is sending money from outside the United States and for transactions using a foreign currency.

91.    PayPal also earns interest and returns by combining users' account balances and investing those funds. PayPal owns the interest and other earnings from those investments.

**5.    PayPal Is Licensed as a Money Transmitter and Subject to Various Anti-Money Laundering and Counter-Terrorist Financing Laws and Regulations**

92.    PayPal operates an online payment business. It purports to provide users the ability to securely transfer money over the Internet.

93.    PayPal is licensed as a Money Transmitter in multiple states and territories across the United States.

94.    A Money Transmitter must maintain federal registration as a Money Services Business and comply with federal reporting and recordkeeping requirements. These requirements include compliance with the Bank Secrecy Act. The United States Department of the Treasury, though its Financial Crimes Enforcement Network, implements, administers and enforces compliance with the Bank Secrecy Act.

95.    A Money Services Business is defined in 31 CRF 1010.100(ff).

COMPLAINT

96.     As a Money Services Business, PayPal is required by federal law to know its customers and understand their money transmission activities. These requirements include implementing anti-money laundering ("AML") provisions and know your customer ("KYC") provisions under the Currency and Foreign Transactions Reporting Act of 1970 a/k/a the Bank Secrecy Act. *See* 31 U.S.C. § 5311; 12 C.F.R. § 208.63; *see also* 31 C.F.R. § 1022.210.

97.     Federal regulations require a Money Services Business to incorporate policies, procedures and internal controls that include provisions for verifying customer identification, filing reports, creating and retaining records and responding to law enforcement requests. 31 C.F.R. § 1022.210. A Money Services Business must also designate a person to assure daily compliance with its AML provisions, provide education and training of appropriate personnel concerning their AML responsibilities, and provide for independent review to monitor the adequacy of the program. *Id*.

98.     A Money Services Business also has requirements to report suspicious transactions relevant to a possible violation of laws or regulations. 31 C.F.R. § 1022.320.

99.     PayPal is also subject to other anti-money laundering and counter-terrorist financing laws and regulations, including routine reports to the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC").

100.    PayPal has implemented procedures to verify the identity of its customers and monitor international and domestic transaction to detect fraud.

101.    PayPal has had a cavalier attitude regarding the anti-money laundering rules and regulations and has been the subject of regulatory action by the OFAC as a result of its conduct in 2015. It recently disclosed subsequent potential violations after the 2015 action.

### 6.     PayPal Facilitated and Profited from Traffic Monsoon's Ponzi Scheme

102.    PayPal transmitted investors' money to and from Traffic Monsoon for the purchase of investments and enabled the Traffic Monsoon scheme to grow and operate, and perpetrate its fraudulent, Ponzi/pyramid operations.

103.    PayPal's association with Traffic Monsoon was instrumental – indeed, crucial – to the success of the Traffic Monsoon Scheme.

104.    Traffic Monsoon kept all of its funds in PayPal Account 7752.

105.    An investor would purchase an AdPack by transferring $50 from the investor's PayPal account to PayPal Account 7752.

106.    Traffic Monsoon aggregated all of the purchase money that it received from its investors in PayPal Account 7752. All investor funds were commingled in PayPal Account 7752.

107.    When an investor wanted to cash out earnings from Traffic Monsoon, Traffic Monsoon would send the money to the investor from PayPal Account 7752, less PayPal's fees for the transaction, in facially obvious Ponzi scheme fashion.

108.    Because of the fees charged by PayPal, Traffic Monsoon would not transfer funds from PayPal Account 7752 unless the amount of the transfer was above $2.00.

109.    PayPal charged Traffic Monsoon to transfer the funds to the investor. If this charge was done through mass pay, then it would be 2% of the transaction with a cap at $1 per recipient per transaction. Applying this example to Traffic Monsoon, PayPal may have earned $1 for each transfer request for returns based on the investment in single AdPack. For example, if an investor requested a return of $55, which was the maximum amount an AdPack could earn with revenue sharing, then PayPal would charge Traffic Monsoon $1 for the transfer because the fee is capped at $1 ($55 x 2% = $1.21).

110.    If an investor did not request the funds to be transferred from Traffic Monsoon, the funds would remain in PayPal Account 7752.

111.    An investor could purchase additional AdPacks using funds in the investor's Traffic Monsoon account. Traffic Monsoon would then change the accounting for this money, but the money would remain in PayPal Account 7752.  An investor would "save money" by purchasing AdPacks by using funds held within Traffic Monsoon because PayPal would not charge a fee for this "transfer." No fee would be charged because the funds physically remained within PayPal Account 7752.

112.    Until July 2016, Scoville kept almost all of Traffic Monsoon's business funds in PayPal Account 7752.

113.    From October 2014 until February 2016, PayPal received $134 million from investors to deposit into Traffic Monsoon's PayPal account. PayPal also paid out approximately $61 million to investors from Traffic Monsoon's PayPal account.

114.    Given that PayPal Account 7752 contained only commingled funds from investors, PayPal's payments of funds to existing Traffic Monsoon investors, at Traffic Monsoon's direction, were on their face Ponzi/pyramid payments.

115.    During this time, PayPal served almost exclusively as the payment processor for investors' payments to Traffic Monsoon. PayPal held nearly all of the investors' funds from AdPacks in PayPal Account 7752.

116.    PayPal profited greatly from the Traffic Monsoon Scheme.

117.    PayPal earned considerable fees from the funds it transferred for each of Traffic Monsoon's "sales," which totaled approximately $134 million since Scoville opened the account in September 2014.

118.    PayPal also earned returns on the investors' money that Traffic Monsoon held in its PayPal account. The returns on this account were significant – and extraordinary in nature, given that Traffic Monsoon held – not just transferred – millions in PayPal Account 7752, even though Traffic Monsoon did not earn interest on the account balance. For example, the balance of Traffic Monsoon's account with PayPal was approximately $61 million in February 2016.

119.    PayPal was closely monitoring Traffic Monsoon's account and the investments into and the withdrawals from that account. Indeed, in December 2015, PayPal told Traffic Monsoon that its account was one of PayPal's best performing accounts.

120.    Through its close monitoring of the transactions in the Traffic Monsoon account, PayPal learned from the very beginning of Traffic Monsoon's operations that Traffic Monsoon was commingling investor money and was paying existing investors with new investor money, in Ponzi/pyramid scheme fashion and contrary to its representations to its members.

### 7.  PayPal's Prior Experience With Scoville And Pay-to-click Businesses

121.    Scoville has a history of operating fraudulent pay-to-click "businesses" using PayPal.

122.    In 2010 and 2011, Scoville owned and operated six pay-to-click businesses: TviPtc, InfinityBux, BuxSecure, PowerfulBux, ForeverBux and BuxUnleased (the "PTC Businesses").

123.    All six of the PTC Businesses relied on PayPal to facilitate sales.  All six shared the same account with PayPal.

124.    In May 2011, customers complained to PayPal and claimed that Scoville's PTC Businesses were involved in fraudulent transactions. Customers were reversing payments sent to the PTC Businesses, i.e. creating "chargebacks" against the PTC Businesses' account.

125.    PayPal froze the PTC Businesses' account following allegations of fraud and the increased numbers of chargebacks attributed to the account.

126.    Thereafter, PayPal conducted an investigation into the investors' allegations and banned Scoville from using its services for the PTC Businesses.

127.    The PTC Businesses could not recover from PayPal's freeze on the account and subsequent ban on using PayPal's services. Scoville closed the PTC Businesses in 2013.

128.    In addition to banning Scoville's PTC Businesses, PayPal also has banned other pay-to-click businesses from using its services.  Indeed, PayPal is well acquainted with this industry and is aware that some of these businesses have Ponzi/pyramid scheme features and imbue fraudulent schemes.

**8.  PayPal Substantially Assisted the Traffic Monsoon Scheme with Knowledge That Traffic Monsoon Made Misrepresentations to Investors and Operated as a Ponzi/Pyramid Scheme.**

**a.  PayPal Was Aware of Traffic Monsoon and Scoville's Misrepresentations and Fraud**

129.    In September 2014, PayPal allowed Scoville to open an account to operate a new pay-to-click "business," Traffic Monsoon, even though PayPal had banned Scoville from using its services for his previous pay-to-click "businesses" following allegations that Scoville had operated those "businesses" as a fraudulent scheme.

130.    PayPal requires an account holder to enter identifying information so that PayPal

can verify the identity of the customer. PayPal requires additional information to open a merchant account so that it can verify the business associated with the account. PayPal also uses this information to monitor for and protect customers from fraudulent transactions.

131.    To open the new pay-to-click account, Scoville provided PayPal his name, social security number, date of birth, home address, phone numbers, business name "Traffic Monsoon"), business website address (http://www.trafficmonsoon.com), and email address for the account  (paypal@trafficmonsoon.com). Scoville also told PayPal that Traffic Monsoon's business was "Investments – general" and provided PayPal with Traffic Monsoon's website address, http://www.trafficmonsoon.com.

132.    As part of PayPal's customer identification and sign-up process for a merchant account, on or about September 2014, PayPal "verified" the information provided by Scoville about Traffic Monsoon. Scoville told PayPal that Traffic Monsoon's business was "Investments – general" and provided PayPal with Traffic Monsoon's website address, http://www.trafficmonsoon.com. As such, PayPal reviewed Traffic Monsoon's website and discovered that Traffic Monsoon falsely told investors that it was offering advertising services, not investments. Indeed, Traffic Monsoon required investors to agree that they were not purchasing investments. Further, Traffic Monsoon's website indicated that Traffic Monsoon was a pay-to-click business, similar to the businesses previously operated by Scoville that PayPal had banned from using its services following allegations of fraud.

133.    PayPal also learned from its review of the Traffic Monsoon website that Traffic Monsoon was offering pyramid scheme payments to investors, e.g. Traffic Monsoon referred to the company as offering referral-based commission structures and referral based income opportunities.

134.    PayPal thus became aware that Traffic Monsoon misrepresented to investors the nature of its services and that Traffic Monsoon was a pyramid scheme.

135.    PayPal also learned from its review of Traffic Monsoon's website that investors in AdPacks were expecting to receive shares of revenues generated from Traffic Monsoon's purported advertising business. Thus, PayPal was aware that Traffic Monsoon and Scoville

would receive investor funds to manage and repay with a profit.

136.    Accordingly, on or about September 2014, PayPal was aware that: 1) Scoville was the user associated with PayPal Account 7752 when Scoville opened the account for Traffic Monsoon and that PayPal had previously banned Scoville from using its services following allegations that his prior pay-to-click businesses, which also purportedly sold advertising businesses with revenue sharing, were Ponzi/pyramid schemes; 2) Traffic Monsoon would hold investors' money in PayPal Account 7752; 3) Traffic Monsoon was a pay-to-click scheme that was substantially similar to the pay-to-click businesses run by Scoville that PayPal had banned previously; 4) Traffic Monsoon was falsely representing to investors the nature of its services as not offering investments; and 5) Traffic Monsoon was a pyramid scheme.

137.    Despite its knowledge of Traffic Monsoon's misrepresentations to investors and its previous ban on Scoville's similar use of its services, PayPal nonetheless allowed Scoville to open PayPal Account 7752 for its business of selling investments and marked the account as "Business – Verified – Cat201VC."

138.    PayPal also was aware that Traffic Monsoon was operating a Ponzi/pyramid scheme and that Traffic Monsoon was commingling investor money and paying existing investors with new investors' money, in obvious Ponzi/pyramid scheme fashion.  PayPal was aware of this scheme and these payments as a result of 1) its knowledge that Traffic Monsoon was holding investors' money in PayPal Account 7752 gained from PayPal's review of Traffic Monsoon's website and account verification process; 2) its ongoing monitoring of Traffic Monsoon's account, which PayPal itself acknowledged when it told Traffic Monsoon that it was one of its best performing accounts; 3) its fraud monitoring systems, and 4) the AML and KYC procedures required by federal law.

139.    For example, PayPal's monitoring of Traffic Monsoon's account included monthly review of the number of transactions, average amount of these transactions, the money received from Traffic Monsoon investors and a review of monthly account "Rollups," which involved a review of the amount received in an account and the percentage of chargebacks. PayPal reviews this information as part of its merchant account services and fraud monitoring

systems.   PayPal was thus aware that Traffic Monsoon's account, PayPal Account 7752, showed exponential growth with a small percentage of chargebacks as shown in the chart below:

| Date | Received | CBK % ($) |
|------|----------|-----------|
| October 2014 | $60,269.02 | 0% |
| November 2014 | $103,821.14 | 0% |
| December 2014 | $100,186.67 | 0% |
| January 2015 | $201,580.39 | 0% |
| February 2015 | $361,354.64 | 0.01% |
| March 2015 | $624,020.91 | 0% |
| April 2015 | $1,469,989.45 | 0.01% |
| May 2015 | $2,358,181.91 | 0.36% |
| June 2015 | $3,666,178.12 | 0% |
| July 2015 | $5,008,550.36 | 0.02% |
| August 2015 | $6,509,319.82 | 0.09% |
| September 2015 | $11,639,878.75 | 0.01% |
| October 2015 | $17,687,476.64 | 0.01% |
| November 2015 | $23,984,456.77 | 0.01% |
| December 2015 | $28,939,277.27 | 0.13% |

140.   Indeed, PayPal praised Traffic Monsoon on the performance of its account with the low chargebacks – further demonstrating PayPal's ongoing monitoring of Traffic Monsoon's account and of the transactions in that account. As stated above, in December 2015, PayPal told Scoville that Traffic Monsoon's account was one of the best performing accounts in its category.

141.   Despite PayPal's knowledge that Scoville was misrepresenting to investors that it did not offer investments, that Traffic Monsoon was a Ponzi/pyramid scheme and that Traffic Monsoon was commingling investor money and paying existing investors with new investors'

money in obvious Ponzi/pyramid scheme fashion, PayPal allowed and supported Traffic Monsoon's use of its services to effect investments in the Traffic Monsoon Scheme, unimpaired, until January 11, 2016.

### b. PayPal Provided Substantial Assistance to Traffic Monsoon and Scoville's Fraud and Misrepresentations

142.    From about September 2014 through January 11, 2016, PayPal knowingly provided substantial assistance to Traffic Monsoon and Scoville's fraud and misrepresentations by allowing Traffic Monsoon to use its services in a highly a-typical and extraordinary manner as described below:

A.    PayPal allowed Scoville to open an account for Traffic Monsoon and use its services to operate a Ponzi/pyramid scheme, even though PayPal had previously banned similar pay-to-click businesses that Scoville operated from using its services following allegations and findings that those businesses were a fraudulent scheme.

B.    PayPal also allowed Scoville to open an account for Traffic Monsoon and use its services to operate a Ponzi scheme, even though PayPal was aware that Traffic Monsoon was misrepresenting to investors that Traffic Monsoon was not selling investments.

C.    PayPal allowed Traffic Monsoon to use its services to support a Ponzi/pyramid scheme, which is a violation of PayPal's acceptable use policy.

D.    PayPal allowed Traffic Monsoon to use PayPal Account 7752 to hold millions of dollars of investors' funds, month after month after month. This activity was a radical departure from PayPal's business as a payment processor.

143.    PayPal also knowingly provided substantial assistance to Traffic Monsoon and Scoville's fraud and misrepresentations by cloaking the Traffic Monsoon's Ponzi/pyramid scheme with a false air of legitimacy that assisted Traffic Monsoon's ability to deceive investors, including Plaintiffs and the proposed Class, into purchasing AdPacks.  Through its account verification process, PayPal learned of, and thereafter knowingly allowed, Traffic

Monsoon's displaying of PayPal's name on Traffic Monsoon's website and use an email address, "paypal@trafficmonsoon.com." . PayPal created this false sense of security, among other methods, by representing that PayPal monitors users' accounts for fraud and prohibits "transactions that support . . . Ponzi schemes" while knowingly allowing Traffic Monsoon to operate a Ponzi/pyramid scheme using PayPal's services.

**9. From January 11, 2016 Until February 11, 2016 PayPal Suspends Withdrawals from Traffic Monsoon's Account, but Allows Traffic Monsoon to Continue to Use Its Services to Receive Money from New Investors.**

144.    On January 11, 2016, PayPal decided to suspend Traffic Monsoon's ability to *withdraw* funds from Traffic Monsoon's account.

145.    PayPal did so because its merchant risk department (a department/group that was different from the merchant services department/group that worked with Traffic Monsoon's account on a regular basis, learned about the Ponzi/pyramid-like transactions in the account, allowed it to operate, and had praised Scoville for the performance of Traffic Monsoon's account) decided to place a freeze on Traffic Monsoon's account and the transactions in that account.  The risk department placed this freeze on Traffic Monsoon's account ostensibly because Traffic Monsoon's account experienced a high percentage of growth with a small percentage of chargebacks.  PayPal later explained that these characteristics show a Ponzi scheme.

146.    PayPal told Scoville that it was placing a freeze on the account because Traffic Monsoon was growing too fast, too quickly and had almost no chargebacks or refund requests.

147.    PayPal also established a specific telephone number for investors to call to address concerns regarding Traffic Monsoon.

148.    Thereafter, PayPal told some investors who contacted PayPal that Traffic Monsoon was a scam.

149.    Even though PayPal had suspended withdrawals from the account, PayPal nonetheless continued to allow investors to send money to Traffic Monsoon's PayPal account. In turn, PayPal continued to earn fees from these transfers and interest on the investors' money

that was deposited in Traffic Monsoon's account.

150.   On February 11, 2016, PayPal suspended all transactions to and from Traffic Monsoon's account.  PayPal told Scoville that it intended the freeze on all transactions to last for 180 days, *i.e.* until August 9, 2016.

**10. PayPal Prematurely Removed the Freeze on Traffic Monsoon's Account and Allowed Scoville to Abscond Millions from PayPal Account 7752.**

151.   Although PayPal indicated that the freeze on Traffic Monsoon's account would last until August 2016, PayPal prematurely (on July 11, 2016) removed the freeze on the account.

152.   PayPal explained that the freeze on PayPal Account 7752 expired "unbeknownst to PayPal employees monitoring the account" – a clear demonstration of PayPal's inadequate control systems and of the fact that crucial information regarding Traffic Monsoon's fraud was not being shared across PayPal departments that needed to be aware of such information.

153.   After PayPal improperly removed the freeze, Scoville transferred more than $23 million out of Traffic Monsoon's PayPal account into a separate, personal account. He accomplished this by withdrawing $100,000 at a time, many hundreds of times, and typically multiple times per day.

154.   Scoville's looting of PayPal Account 7752 ended on July 26, 2016 when the SEC filed a complaint against Traffic Monsoon and Scoville alleging that Traffic Monsoon and Scoville were conducting an illegal Ponzi scheme in violation of federal securities laws (the "SEC Action").

155.   On the same day, the United States District Court for the District of Utah granted a temporary restraining order that froze all of the assets of Scoville and Traffic Monsoon, including the Traffic Monsoon PayPal account. The court appointed a receiver to preserve the remaining assets of Traffic Monsoon and the assets of Scoville.

156.   Thereafter, Traffic Monsoon was shut down.

157.   Plaintiffs and the proposed Class have lost millions of dollars in investments in Traffic Monsoon.

COMPLAINT

**11. <u>The Perfect Storm: Chaos Within PayPal in Handling Traffic Monsoon's</u>**
   **<u>Fraud.</u>**

158.    While PayPal prides itself on, and advertises, its anti-fraud detection systems, its internal controls were lacking at best, and nonexistent at worst, with regards to its oversight of its Traffic Monsoon-related activities.

159.    Further, the internal communications between various PayPal departments and individuals charged with interacting with customers, overseeing customer accounts, and detecting and preventing fraud or misconduct in the PayPal accounts either broke down or were nonexistent.

160.    Examples of such communication inadequacies between various PayPal departments and individuals include:

A.    One PayPal department allowed Scoville to operate a new pay-to-click program through PayPal after another PayPal department banned him from operating several other, substantially identical, pay-to-click programs, all of which were associated with his name.

B.    Certain PayPal agents and/or departments reviewed Scoville's Traffic Monsoon website, which indicated Traffic Monsoon was not an investment, and also the Traffic Monsoon file with PayPal, which indicated that Traffic Monsoon was an investment. These agents and/or departments, however, failed to take steps to either address this facial – and material – misrepresentation and/or bring it to the attention of other PayPal departments.

C.    One PayPal department reviewed Scoville's Traffic Monsoon account on a regular basis, learned about the Ponzi/pyramid-like transactions in the account and allowed it to continue to operate; while a different PayPal department reviewing the account shut it down, ostensibly for experiencing a high percentage of growth with a small percentage of chargebacks, which PayPal understood to show a Ponzi scheme.

D.    One PayPal agent and/or department praised Scoville for the growth in its

Traffic Monsoon account, while shortly thereafter another PayPal department froze that same account.

E.    Different PayPal agents and/or departments gave Traffic Monsoon investors different information regarding the reason for the freeze. Specifically, different PayPal agents and/or departments told some investors that PayPal froze Traffic Monsoon's account because Traffic Monsoon was a scam. Yet other agents and/or departments told investors that PayPal froze Traffic Monsoon's account because Traffic Monsoon was a high-risk account with a high number of chargebacks.

F.    Different PayPal agents and/or departments gave Traffic Monsoon investors different information regarding the investors' ability to receive refunds for their Traffic Monsoon investments. For example, PayPal told some investors that they should wait 180-days to make a claim for a refund, while telling other investors to contact their banks or credit card companies.

G.    Different PayPal agents and/or departments treated differently the refund requests made by Traffic Monsoon investors, and refunded money to some investors while declining to do the same for other investors.

H.    One PayPal department purported to implement a freeze of Scoville's Traffic Monsoon account through August 2016, while another PayPal department lifted the freeze on that same account on July 11, 2016, almost one full month before it was scheduled to expire.  As a result, Scoville was able to withdraw more than $23 million from the account.

I.    While one PayPal department sought to implement a freeze of Scoville's Traffic Monsoon account purportedly for fraud, a different department allowed Scoville to withdraw money from that account in increments of $100,000 per withdrawal, with many such $100,000 withdrawals *daily* for a period of 15 days.

161.    Such flagrant inadequacies and/or breakdowns in PayPal's internal controls and communications between various PayPal agents and/or departments played a key role in

COMPLAINT

enabling the Traffic Monsoon scheme and help explain why PayPal allowed Traffic Monsoon to continue to operate its fraud and pyramid/Ponzi scheme through PayPal's account, with knowledge of such fraud and pyramid/Ponzi scheme.

**CLASS ACTION ALLEGATIONS**

162.    This action is brought by Plaintiffs, for themselves and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

**Class Definition**

163.    The proposed Class (the "Class") is defined as follows:

All persons who invested in Traffic Monsoon by purchasing an AdPack by transferring funds into Traffic Monsoon's PayPal account between September 2014 and February 11, 2016, who have not received a refund of their funds invested in Traffic Monsoon from PayPal and who resided outside of the United States at the time of their investment in Traffic Monsoon.

164.    Excluded from the class are (1) Defendants; (2) any person, firm, trust, corporation, or other entity related to or affiliated with Defendants; and (3) any judge or judicial officer who may hear any aspect of this case and his or her law clerks.

**Numerosity**

165.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members remains unknown at this time, it is estimated that the Class includes in excess of 100,000 individuals who reside in multiple countries. The exact number of the Class members is within the knowledge of Defendant and/or the Court-appointed Receiver in the SEC Action.

**Commonality**

166.    There are common questions of law and fact in this class action that relate to and affect the rights of each member of the Class, including, *inter alia*:

A.    Whether Traffic Monsoon sold securities;

B.    Whether the Traffic Monsoon securities were unregistered and not exempt    from registration;

C.      Whether Traffic Monsoon orchestrated a public securities offering;

D.      Whether Traffic Monsoon and Scoville defrauded the investors,

E.      Whether Traffic Monsoon and Scoville misused (converted) their investors' money;

F.      Whether Traffic Monsoon and Scoville owed fiduciary duties to investors and breached such duties;

G.      Whether Traffic Monsoon was a Ponzi/pyramid scheme;

H.      Whether PayPal owed duties to Plaintiffs and the members of the Class;

I.      Whether Traffic Monsoon was a fiduciary as to Plaintiffs and the Class members' money held in PayPal Account 7752;

J.      Whether PayPal breached duties owed to Plaintiffs and the Class by failing to conform its conduct to the requirements of the law, applicable regulations and PayPal's Acceptable Use Policy;

K.      Whether PayPal knew that Traffic Monsoon and it organizer were misusing and commingling investor money and/or using such money for Ponzi scheme payments;

L.      Whether PayPal knowingly provided substantial assistance to Traffic Monsoon and its organizer's fraud and breach of fiduciary duties;

M.      Whether PayPal failed to use reasonable care as a money transmitter and as a depository of Traffic Monsoon's account that held Plaintiffs and the proposed Class members' funds;

N.      Whether PayPal was negligent in its oversight of the Traffic Monsoon PayPal account;

O.      Whether PayPal was grossly negligent in its oversight  of  the  Traffic Monsoon PayPal account;

P.      Whether PayPal's misconduct entitles Plaintiffs and members of the Class to damages for the loss of the amounts invested by Plaintiffs and members of the Class;

COMPLAINT

Q.    What remedies are appropriate compensation for the damages caused to Plaintiffs and each member of the Class; and

R.    Whether the Plaintiffs and members of the Class are entitled to a reasonable award of attorneys' fees, interest and costs of suit.

**Typicality**

167.    The claims of Plaintiffs are typical of all Class members. The claims of Plaintiffs are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class. Plaintiffs is situated identically to all members of the Class with respect to issues presented in this case, as Plaintiffs and all members of the Class were investors in Traffic Monsoon and suffered the exact same type of loss (in proportion to their investment).

168.    All Class members have been adversely affected by the wrongdoing of the Defendant described herein.

**Adequacy of Representation**

169.    Plaintiffs will adequately represent and protect the interests of the Class and have no interests that conflict with or are antagonistic to the interests of the Class.

170.    Plaintiffs have retained attorneys who are experienced in, and capable of prosecuting, complex class actions such as this case. The attorneys for Plaintiffs and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof. The attorneys for Plaintiffs have adequate resources, experience and commitment to litigate this matter.

**Predominance and Superiority**

171.    A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and undesirable for each of the individual Class members who have suffered damages to bring separate actions. Some investors invested amounts in Traffic Monsoon that would make it impracticable for them to litigate individualized securities fraud cases concerning this matter. Moreover, the common issues identified above predominate over individual issues, if any, particular to each class member. The Traffic Monsoon Scheme made uniform misrepresentations and was responsible for

uniform omissions with respect to each member of the Class, and each member of the Class was injured in exact proportion to the amount of their net investment in Traffic Monsoon.

## COUNT ONE

## AIDING AND ABETTING FRAUD

172.     Plaintiffs and the proposed Class repeat and re-allege each of the allegations set forth above.

173.     As set forth herein, Traffic Monsoon and Scoville knowingly defrauded investors because Traffic Monsoon was a Ponzi/pyramid scheme. On its website, Traffic Monsoon, through Scoville, also knowingly misrepresented to AdPack investors that they were purchasing advertising services with the opportunity to share in revenues that Traffic Monsoon received from its advertising business, that their purchases were not investments and that Traffic Monsoon was not a Ponzi/pyramid scheme, and omitted to disclose to AdPack investors that they were purchasing investments, that he was paying existing Traffic Monsoon investors with new Traffic Monsoon investor money, and that Traffic Monsoon was a Ponzi/pyramid scheme. Scoville also omitted to disclose to investors that he had been banned before by PayPal for orchestrating other pay-to-click schemes.

174.     Plaintiffs and the proposed Class were unaware, when they invested, of the falsity of Traffic Monsoon and Scoville's representations and their omissions, and that Traffic Monsoon was operating a Ponzi/pyramid scheme.

175.     Traffic Monsoon and Scoville's misrepresentations and omissions were material to Plaintiffs and members of the proposed Class's decision to purchase AdPacks from Traffic Monsoon.

176.     Traffic Monsoon and Scoville intended Plaintiffs and the Class to rely on these misrepresentations and omissions.

177.     Plaintiffs and members of the proposed Class relied to their detriment on Traffic Monsoon and Scoville's misrepresentations and omissions when purchasing AdPacks.

178.     Plaintiffs and members of the proposed Class were injured by Traffic Monsoon's Ponzi/pyramid scheme, misrepresentations and omissions when their funds were misused by

Traffic Monsoon and Scoville and used to make Ponzi/pyramid scheme payments to other investors.

179.   As set forth above, PayPal had actual knowledge of Traffic Monsoon and Scoville's fraud and misrepresentations and omissions.   Its actual knowledge included the following facts, among others:

A.   PayPal was aware that Traffic Monsoon was misrepresenting to investors that it sold advertising services - not investments - and that Traffic Monsoon failed to disclose that the AdPack arrangements were investments, because PayPal reviewed Traffic Monsoon's website and information provided by Scoville when Scoville applied for a merchant account for Traffic Monsoon. To apply for a merchant account, Scoville provided PayPal with personal identifying information, including his social security number and told PayPal that Traffic Monsoon's business was selling investments. From its account verification process, PayPal learned that Scoville was the user associated with PayPal Account 7752 and thus was aware that PayPal had previously banned Scoville from using its services following allegations that his prior pay-to-click businesses, which also purportedly sold advertising businesses with revenue sharing were Ponzi/pyramid schemes. PayPal also reviewed Traffic Monsoon's website and learned that Traffic Monsoon would hold investors' money in its PayPal account, Traffic Monsoon was a pay-to-click scheme that was substantially similar to the pay-to-click businesses run by Scoville that PayPal had banned previously following allegations that those businesses were Ponzi/pyramid schemes, Traffic Monsoon was falsely representing to investors the nature of its services as selling advertising services, not investments; and Traffic Monsoon was a Ponzi/pyramid scheme.

B.   PayPal also became aware that Traffic Monsoon was operating a Ponzi/pyramid scheme and that Traffic Monsoon was commingling investor money and paying existing investors with new investors' money, in obvious

Ponzi/pyramid scheme fashion.  PayPal became aware of this scheme and these payments as a result of the following:

    i. its review of Traffic Monsoon's website and account verification process as detailed in (A);

    ii. its ongoing monitoring of Traffic Monsoon's account, which PayPal itself acknowledged when it told Traffic Monsoon that it was one of its best performing accounts, which showed, among other things, Ponzi scheme payments from Account 7752 and Traffic Monsoon's exponential growth resulting from the Ponzi/pyramid scheme;

    iii. its fraud monitoring systems, and

    iv. the AML and KYC procedures required by federal law.

C.    PayPal told some investors who contacted PayPal that Traffic Monsoon was a fraudulent scam.

180.    PayPal knowingly provided substantial assistance to Traffic Monsoon and Scoville's fraud and misrepresentations.  Without this substantial assistance, Traffic Monsoon and Scoville would not have been able to carry out their scheme.  The substantial—vital—assistance included the following:

A.    PayPal knowingly allowed the Traffic Monsoon pyramid scheme to use its services in a highly atypical manner:

    i. PayPal allowed Scoville to open an account for Traffic Monsoon and use its services to operate a Ponzi/pyramid scheme, even though PayPal had previously banned similar pay-to-click businesses that Scoville operated from using its services following allegations that those businesses were a fraudulent scheme.

    ii. PayPal also allowed Scoville to open an account for Traffic Monsoon and use its services to operate a Ponzi/pyramid scheme,

even though PayPal was aware that Traffic Monsoon was misrepresenting to investors that Traffic Monsoon was not selling investments.

iii.    PayPal allowed Traffic Monsoon to use its services to support a Ponzi/pyramid scheme, which is a violation of PayPal's acceptable use policy.

iv.    PayPal allowed Traffic Monsoon to use PayPal Account 7752 to hold millions of dollars of investors' funds, month after month after month. This activity was a radical departure from PayPal's business as a payment processor.

B.    PayPal cloaked the Traffic Monsoon's Ponzi/pyramid scheme with a false air of legitimacy that assisted Traffic Monsoon's ability to deceive investors, including Plaintiffs and the proposed Class, into purchasing AdPack investments. PayPal created this false sense of security, among other methods, by representing that PayPal monitors users' accounts for fraud and prohibits "transactions that support . . . Ponzi schemes" while knowingly allowing Traffic Monsoon to operate a Ponzi/pyramid scheme using PayPal's services. PayPal also knowingly allowed Traffic Monsoon to display its name on Traffic Monsoon's website and use an email address, "paypal@trafficmonsoon.com," information that PayPal learned during its account verification process.

C.    In January 2016, PayPal suspended withdrawals from Traffic Monsoon's PayPal Account 7752, but did not suspend deposits into PayPal Account 7752. As a result, PayPal assisted the continuance of the Traffic Monsoon Ponzi scheme by allowing investors to continue to purchase AdPacks.

D.    After PayPal suspended withdrawals from Traffic Monsoon's PayPal Account 7752 because Traffic Monsoon was a pyramid/Ponzi scheme, PayPal failed to notify Plaintiffs and the proposed Class about Traffic Monsoon and Scoville's operation of the Ponzi/pyramid scheme thereby allowing Traffic

COMPLAINT

Monsoon to continue the Ponzi/pyramid scheme and hindering Plaintiffs and the proposed Class members' ability to seek chargebacks and/or refunds for payments made to Traffic Monsoon.

E.      Without providing notice to Plaintiffs and the proposed Class, PayPal prematurely lifted the freeze on Traffic Monsoon's PayPal Account 7752 thereby allowing Scoville to withdraw and misappropriate funds from PayPal Account 7752.

181.    PayPal's actions described above proximately caused Plaintiffs and the proposed Class to lose money by investing in the Traffic Monsoon Ponzi/pyramid scheme.

182.    PayPal received substantial and highly atypical compensation for its services provided to Traffic Monsoon in connection with its PayPal Account 7752. This compensation includes, in addition to transfer fees, PayPal's free use of millions and millions of dollars kept by Traffic Monsoon in its PayPal account with no interests, for nearly a year and a half. Indeed, as of February 2016, the funds held in PayPal Account 7752 had a balance of over $61 million.

183.    This substantial and highly atypical compensation incented PayPal to assist Traffic Monsoon's fraud.

184.    PayPal's knowing substantial assistance to Traffic Monsoon and Scoville's fraud and misrepresentations described above proximately caused Plaintiffs and the proposed Class members' losses of their investments that resulting from the Traffic Monsoon Ponzi/pyramid scheme.

185.    As a direct and proximate consequence of PayPal's misconduct described above, Plaintiffs and the proposed Class have lost over $5 million invested in Traffic Monsoon.

## COUNT TWO

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

186.    Plaintiffs and the proposed Class members repeat and re-allege each of the allegations set forth above.

187.    By purchasing an AdPack and becoming a Traffic Monsoon member, Plaintiffs

and the proposed Class members placed trust and confidence in Traffic Monsoon and Scoville, Traffic Monsoon's principal, driving force, and sole employee, to oversee their investments and allocate and distribute their share of Traffic Monsoon's daily profit from the sale of its seven advertising products. Plaintiffs and the proposed Class members relied on Traffic Monsoon and Scoville to provide and make these returns, allocations and distributions. Traffic Monsoon and Scoville, who had superior knowledge regarding Traffic Monsoon's operations and how investor money was handled and used, knowingly accepted this trust and confidence from Plaintiffs and proposed Class members.

188.    Traffic Monsoon and Scoville also acted as Plaintiffs and the Class members' agent and trustee of their investments and shares of revenue that were held in PayPal Account 7752. Traffic Monsoon required Plaintiffs and proposed Class members to leave their share of revenue in Traffic Monsoon's possession, PayPal Account 7752, until their share of revenue reached a certain threshold. Plaintiffs and the proposed Class members entrusted Traffic Monsoon and Scoville to hold and safeguard their funds until eligible for withdrawal from PayPal Account 7752 and until Plaintiffs and the proposed Class members requested withdrawal of the funds.

189.    Traffic Monsoon and Scoville owed Plaintiffs and the proposed Class members fiduciary duties. These duties included using Plaintiffs and the proposed Class members' investment money as promised and not converting it or using it for purposes other than those for which that money had been entrusted to Traffic Monsoon and Scoville; managing the distribution and allocation of Plaintiffs and the proposed Class members' revenue shares; distributing these shares; and holding and safeguarding Plaintiff and the proposed Class members' investments and shares of revenue until withdrawn from PayPal Account 7752.

190.    As fiduciaries, Traffic Monsoon and Scoville owed Plaintiffs and the proposed members of the Class a duty of care regarding the funds entrusted by Plaintiffs and the proposed Class members to Traffic Monsoon and Scoville, which included the duty to safeguard and properly use such funds; a duty of loyalty, which included the duty to avoid self-dealing and using investor money for Traffic Monsoon's own purposes, i.e. to perpetrate its own pyramid

scheme; and a duty to disclose material information to Plaintiffs and the proposed Class members' regarding their investments, such as the fact that Traffic Monsoon was perpetrating a Ponzi/pyramid scheme and was going to use new investor money to continue such scheme.

191.    Traffic Monsoon and Scoville breached their fiduciary duties by misdirecting, misusing, and converting investor funds for their own benefit – to finance and continue to operate their Ponzi/pyramid scheme, enrich themselves, and defraud their investors, as more fully detailed above.

192.    Traffic Monsoon and Scoville knowingly misrepresented to AdPack investors that they were purchasing advertising services with the opportunity to share in revenues that Traffic Monsoon received from its advertising business.  Traffic Monsoon and Scoville never disclosed to investors that their purchases of AdPacks were investments, that Traffic Monsoon was a Ponzi/pyramid scheme, that Traffic Monsoon could not pay investors without additional sales of AdPacks, that Traffic Monsoon could not deliver the promised number of visitors to the AdPack investor's website, that 99% of the revenues of Traffic Monsoon came from its sales of AdPacks and that Traffic Monsoon was supplementing the revenue sharing by including money from Traffic Monsoon's reserve fund.

193.    Traffic Monsoon and Scoville further breached fiduciary duties owed to Plaintiffs and the proposed Class members by using Plaintiffs and the proposed Class members' shares of revenue, which Traffic Monsoon held in trust in PayPal Account 7752, to pay other Traffic Monsoon members' share of revenue (*i.e.* operating a Ponzi/pyramid scheme), by failing to safeguard Plaintiffs and the proposed Class members' funds held in PayPal Account 7752 and by withdrawing these funds from PayPal Account 7752 without authorization.

194.    Traffic Monsoon and Scoville also breached their fiduciary duties by failing to disclose material information that Traffic Monsoon's sole organizer, Scoville, had a prior history of defrauding investors through similar investment programs in pay-to-click websites, perpetrated through PayPal.

195.    PayPal was aware that Traffic Monsoon and Scoville were fiduciaries to the investors. As set forth above, as part of the account verification process, PayPal was aware that

Traffic Monsoon held investor money in PayPal Account 7752, and Traffic Monsoon and Scoville were receiving investor funds to manage and repay with a profit.

196.    Through its review of Traffic Monsoon's website and account verification process, its ongoing monitoring of Traffic Monsoon's account, which PayPal itself acknowledged when it told Traffic Monsoon that it was one of its best performing accounts; its fraud monitoring systems, and the AML and KYC procedures required by federal law, PayPal knew that Traffic Monsoon and Scoville were breaching fiduciary duties owed to investor as follows:

        A.    Traffic Monsoon and Scoville were commingling investor money in the same Traffic Monsoon account, held by PayPal, of which the sole source of funds in that account was investors' money, and misusing money from that PayPal account to make Ponzi/pyramid scheme payments to earlier Traffic Monsoon investors;

        B.    Traffic Monsoon and Scoville were misleading investors regarding the nature of services provided by Traffic Monsoon as offering advertising services, not investments;

        C.    Traffic Monsoon and Scoville were misusing investor money to pay earlier investors and perpetuate their Ponzi/pyramid scheme;

        D.    Traffic Monsoon and Scoville were misleading their investors by assuring them that Traffic Monsoon was not a Ponzi/pyramid scheme, by misrepresenting to them how their money would be used, and by failing to disclose Scoville's prior history of operating a Ponzi/pyramid scheme through a similar pay-to-click business, that Traffic Monsoon was selling unregistered securities and that Traffic Monsoon was orchestrating a fraudulent Ponzi/pyramid scheme.

197.    PayPal knowingly provided substantial assistance to Traffic Monsoon's breach of its fiduciary duties as set forth below:

        A.    PayPal allowed Traffic Monsoon to use its services in a highly a-typical manner:

i. PayPal allowed Scoville to open an account for Traffic Monsoon and use its services to operate a Ponzi/pyramid scheme even though PayPal had previously banned similar pay-to-click businesses that Scoville operated from using its services following allegations that those businesses were a fraudulent scheme.

ii. PayPal also allowed Scoville to open an account for Traffic Monsoon and use its services to operate a Ponzi scheme even though PayPal was aware that Traffic Monsoon was misrepresenting to investors that Traffic Monsoon was not selling investments.

iii. PayPal allowed Traffic Monsoon to use its services to support a Ponzi/pyramid scheme, which is a violation of PayPal's acceptable use policy.

iv. PayPal allowed Traffic Monsoon to use PayPal Account 7752 to hold millions of dollars of investors' funds, month after month after month. This activity was a radical departure from PayPal's business as a payment processor.

B.       PayPal cloaked the Traffic Monsoon's Ponzi/pyramid scheme with a false air of legitimacy that assisted Traffic Monsoon's ability to deceive investors, including Plaintiffs and the proposed Class, into purchasing AdPacks.  PayPal created this false sense of security, among other methods, by representing that PayPal monitors users' accounts for fraud and prohibits "transactions that support . . . Ponzi schemes" while knowingly allowing Traffic Monsoon to operate a Ponzi/pyramid scheme using PayPal's services.  PayPal knowingly allowed Traffic Monsoon to display its name on Traffic Monsoon's website and use an email address, "paypal@trafficmonsoon.com," information that PayPal learned during its account verification process.

COMPLAINT

C.      In January 2016, PayPal suspended withdrawals from Traffic Monsoon's PayPal Account 7752, but did not suspend deposits into PayPal Account 7752. As a result, PayPal assisted the continuance of the Traffic Monsoon Ponzi/pyramid scheme by allowing investors to continue to purchase AdPacks.

D.      After PayPal suspended withdrawals from Traffic Monsoon's PayPal Account 7752 because Traffic Monsoon was a pyramid/Ponzi scheme, PayPal failed to notify Plaintiffs and the proposed Class about Traffic Monsoon and Scoville's operation of the Ponzi/pyramid scheme thereby allowing Traffic Monsoon to continue the Ponzi/pyramid scheme and hindering Plaintiffs and the proposed Class members' ability to seek chargebacks and/or refunds for payments made to Traffic Monsoon.

E.      Without providing notice to Plaintiffs and the proposed Class, PayPal prematurely lifted the freeze on Traffic Monsoon's PayPal Account 7752 thereby allowing Scoville to withdraw and misappropriate funds from PayPal Account 7752.

198.    PayPal's actions described above proximately caused Plaintiffs and the proposed Class members to lose money by purchasing AdPack investments in the Traffic Monsoon Ponzi scheme.

199.    PayPal received substantial and highly atypical compensation for its transfer of money to and from Traffic Monsoon's PayPal Account 7752. This compensation includes, in addition to transfer fees, PayPal's free use of millions and millions of dollars kept by Traffic Monsoon in its PayPal account with no interests, for nearly a year and a half. Indeed, as of February 2016, the funds held in PayPal Account 7752 had a balance of over $61 million.

200.    This substantial and highly atypical compensation incented PayPal to turn a blind eye and continue to assist Traffic Monsoon's breach of fiduciary duty.

201.    By virtue of its knowing, substantial and material assistance to the Traffic Monsoon Scheme, PayPal was aware of its role in the Traffic Monsoon's breach of fiduciary duty and it acted knowingly in assisting the Traffic Monsoon Scheme.

45

COMPLAINT

202.    PayPal's substantial assistance and misconduct described above proximately caused Plaintiff and the proposed Class members' losses resulting from the Traffic Monsoon Ponzi scheme, including Traffic Monsoon's misuse of Plaintiffs and the proposed Class members' money, because it and proximately resulted in Plaintiffs and the proposed Class members' loss of their investments.

203.    As a direct and proximate consequence of PayPal's misconduct described above, Plaintiffs and the proposed members of the Class have lost over $5 million invested in Traffic Monsoon.

**COUNT THREE**

**GROSS NEGLIGENCE**

204.    Plaintiffs and the proposed members of the Class repeat and re-allege each of the allegations set forth above.

205.    Traffic Monsoon held investors' funds in PayPal Account 7752.

206.    PayPal knew that 1) Traffic Monsoon held investors' funds in Account 7752; 2) Traffic Monsoon misappropriated/ misused investors' money; 3) Traffic Monsoon had made false representations to those investors regarding those funds and operated a Ponzi/pyramid scheme using the investors' funds; and 4) Traffic Monsoon was seeking and getting new investor money, i.e. victimizing new investors, to pay earlier investors and continue to orchestrate the fraudulent scheme. Thus, it was foreseeable to PayPal that Traffic Monsoon would continue to use PayPal's infrastructure to victimize even more investors through its Ponzi/pyramid scheme.

207.    As a result of PayPal's knowledge of the fraud, the foreseeability of the harm to the investors and PayPal's knowledge that Traffic Monsoon was using its infrastructure to victimize investors, PayPal owed certain common law duties to Traffic Monsoon's investors. PayPal owed Plaintiffs and the proposed Class members a duty to use reasonable care as a money transmitter and as a depository of Traffic Monsoon's account that held fiduciary funds on behalf of Plaintiffs and the proposed Class members.

208.    PayPal breached these duties as follows:

46

COMPLAINT

A.    PayPal transferred Plaintiffs and the proposed Class members' funds to Traffic Monsoon when, as described above, PayPal was aware, or in the alternative should have known, that Traffic Monsoon was operating a Ponzi/pyramid scheme and misrepresenting to Plaintiffs and the proposed Class members' that they were purchasing advertising services, not purchasing investments, and that Traffic Monsoon was not a Ponzi/pyramid scheme.

B.    PayPal failed to adhere to internal protocols and PayPal's Acceptable Use Policy by allowing Traffic Monsoon's organizer, Scoville, to open PayPal Account 7752 even though PayPal had previously banned similar pay-to-click businesses that Scoville operated from using its services following allegations that these businesses were a fraudulent scheme.

C.    As described above, PayPal provided knowing assistance to further Traffic Monsoon and Scoville's fraud and misrepresentations by allowing Traffic Monsoon and Scoville to use its services in an a-typical and extraordinary manner.

209.    PayPal's conduct showed want of even scant care and/or was an extreme departure from the ordinary standard of care, because, 1) PayPal was aware that Scoville was alleged previously to have operated a Ponzi/pyramid scheme using similar pay-to-click businesses and had banned Scoville from using its services for these businesses;  2) PayPal was familiar with other allegations concerning frauds related to pay-to-click businesses and has banned other such businesses from using its services; 3) PayPal was aware that Traffic Monsoon and Scoville were misleading investors regarding the nature of the business, i.e. that Traffic Monsoon sold advertising services, not investments; 4) PayPal was aware that Traffic Monsoon was making Ponzi/pyramid scheme payments to investors using PayPal Account 7752 and continuing to attract new investors to pay earlier investors in Ponzi scheme fashion; 5) PayPal failed to stop Traffic Monsoon and Scoville from attracting new investors to the scheme even after prohibiting investors from making withdrawals from PayPal Account 7752; and 6) PayPal prematurely lifted the freeze that it placed on PayPal Account 7752, i.e. PayPal had

COMPLAINT

inept, inexistence internal controls.

210.    PayPal's breach of its duty as described above and through this Complaint, directly and proximately caused Plaintiffs and the proposed Class members' loss of their investment in Traffic Monsoon.

211.    As a result of PayPal's gross negligence, Plaintiffs and the proposed Class members have suffered damages of over $5 million.

**COUNT FOUR**

**NEGLIGENCE**

212.    Plaintiffs and the proposed members of the Class repeat and re-allege each of the allegations set forth above.

213.    Plaintiffs and the proposed members of the Class repeat and re-allege each of the allegations set forth above.

214.    Traffic Monsoon held investors' funds in PayPal Account 7752.

215.    PayPal knew that 1) Traffic Monsoon held investors' funds in Account 7752; 2) Traffic Monsoon misappropriated/ misused investors' money; 3) Traffic Monsoon had made false representations to those investors regarding those funds and operated a Ponzi/pyramid scheme using the investors' funds; and 4) Traffic Monsoon was seeking and getting new investor money, i.e. victimizing new investors, to pay earlier investors and continue to orchestrate the fraudulent scheme.  Thus, it was foreseeable to PayPal that Traffic Monsoon would continue to use PayPal's infrastructure to victimize even more investors.

216.    As a result of PayPal's knowledge of the fraud, the foreseeability of the harm to the investors and PayPal's knowledge that Traffic Monsoon was using its infrastructure to victimize investors, PayPal owed certain common law duties to Traffic Monsoon's investors, PayPal owed certain common law duties to Traffic Monsoon's investors.  PayPal owed Plaintiffs and the proposed Class members a duty to use reasonable care as a money transmitter and as a depository of Traffic Monsoon's account that held fiduciary funds on behalf of Plaintiffs and the proposed Class members.

217.    PayPal breached these duties as follows:

48

COMPLAINT

A.      PayPal transferred Plaintiffs and the proposed Class members' funds to Traffic Monsoon when as described above, PayPal was aware, or in the alternative should have known, that Traffic Monsoon was operating a Ponzi/pyramid scheme and misrepresenting to Plaintiffs and the proposed Class members' that they were purchasing advertising services, not purchasing investments, and that Traffic Monsoon was not a Ponzi/pyramid scheme.

B.      PayPal failed to adhere to internal protocols and PayPal's Acceptable Use Policy by allowing Traffic Monsoon's organizer, Scoville, to open PayPal Account 7752 even though PayPal had previously banned similar pay-to-click businesses that Scoville operated from using its services following allegations that these businesses were a fraudulent scheme.

C.      As described above, PayPal providing knowing assistance to further Traffic Monsoon and Scoville's fraud and misrepresentations by allowing Traffic Monsoon and Scoville to use its services in an a-typical and extraordinary manner.

218.    PayPal's breach of its duty as described above and through this Complaint, directly and proximately caused Plaintiffs and the proposed Class members' loss of their investment in Traffic Monsoon.

219.    As a result of PayPal's negligence, Plaintiffs and the proposed Class members have suffered damages of over $5 million.

**COUNT FIVE**

**VIOLATION OF CALIFORNIA CORPORATIONS CODE § 25504.1**

220.    Plaintiffs and the proposed members of the Class repeat and re-allege each of the allegations set forth above.

221.    As set forth above, the investments in Traffic Monsoon were investment contracts and thus "securities" within the meaning of Section 25019 of California's Corporate Securities Law of 1968.

222.    The Traffic Monsoon securities were sold in the state of California under

49

California Corporations Code § 25008 because offers to buy the AdPacks were accepted by Traffic Monsoon in California.  Offers to sell the Adpacks also originated in California since the servers were located in California.

223.   Pursuant to California Corporations Code § 25401, "[i]t is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

224.   As set forth above, the Traffic Monsoon securities were offered and sold to Plaintiffs and the members of the Class through untrue statements of material facts as well as omissions of material facts in violation of California Code § 25401.

225.   Such misrepresented and omitted facts are "material" within the meaning of California Corporations Code § 25401 because they were facts a reasonable investor would consider in deciding whether to invest.

226.   As set forth above, PayPal had actual knowledge of such misrepresentations and omissions made by Traffic Monsoon. PayPal was aware of the true facts that Traffic Monsoon was selling investments, Traffic Monsoon was operating a Ponzi scheme and Scoville, the organizer of Traffic Monsoon, had a history of defrauding investors through similar investment programs.

227.   PayPal is liable for misrepresentations and omissions made in connection with the offer and sale of Traffic Monsoon securities under California Corporations Code 25504.1, because PayPal materially aided, with intent to deceive or defraud, in the acts or transactions constituting violations of § 25504 for the reasons set forth in the preceding paragraphs.

228.   The aid that PayPal provided to the Traffic Monsoon was material – indeed, crucial - because PayPal facilitated the purchase of the securities.

229.   Plaintiffs and members of the Class suffered financial losses because of PayPal's misconduct.

230.   Pursuant to California Corporations Code § 25501, Plaintiffs and the members of

the class are entitled to damages as set forth in the Code.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the proposed Class members for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

(c) Awarding restitution in favor of Plaintiffs and the proposed Class members in the form of disgorging the profits and interest that Defendants earned and received as result of their wrongdoing alleged herein;

(d) Awarding Plaintiffs and the proposed Class members reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e) Such other and further relief as the Court may deem just and proper.


Dated: May 4, 2017                           Respectfully Submitted,


                                             */s/ Adam Wolf*_____
                                             Adam Wolf (SBN 215914)
                                             Peiffer Rosca Wolf
                                             Abdullah Carr & Kane,
                                             A Professional Law Corporation
                                             4 Embarcadero Center
                                             Suite 1400
                                             San Francisco, CA 94111
                                             Telephone: (415) 766-3534
                                             Fax: (415) 402-005
                                             Email: awolf@prwlegal.com

                                             Alan L. Rosca (OBN 0084100)
                                             *Pro hac vice application to be filed*
                                             Lydia M. Floyd (OBN 0088476)
                                             *Pro hac vice application to be filed*
                                             Peiffer Rosca Wolf
                                             Abdullah Carr & Kane,
                                             A Professional Law Corporation

COMPLAINT

1422 Euclid Avenue
Suite 1610 Cleveland, Ohio 44115
Telephone: 216-589-9280
Fax: 888-411-0038
Email: arosca@prwlegal.com
Email: lfloyd@prwlegal.com

*Counsel for Plaintiffs and the proposed Class*

**DEMAND FOR JURY TRIAL**

Plaintiffs and the Class hereby demand a trial by jury.

Dated: May 4, 2017                    Respectfully Submitted,

*/s/ Adam Wolf*_____
Adam Wolf (SBN 215914)
Peiffer Rosca Wolf
Abdullah Carr & Kane,
A Professional Law Corporation
4 Embarcadero Center
Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-3544
Fax: (415) 402-005
Email: awolf@prwlegal.com

Alan L. Rosca (OBN 0084100)
*Pro hac vice application to be filed*
Lydia M. Floyd (OBN 0088476)
*Pro hac vice application to be filed*
Peiffer Rosca Wolf
Abdullah Carr & Kane,
A Professional Law Corporation
1422 Euclid Avenue
Suite 1610 Cleveland, Ohio 44115
Telephone: 216-589-9280
Fax: 888-411-0038
Email: arosca@prwlegal.com
Email: lfloyd@prwlegal.com

*Counsel for Plaintiffs and the proposed Class*

COMPLAINT